928 F.2d 404
 RICO Bus.Disp.Guide 7719
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Nicholas M. DISANTE, Mary DiSante, Vincent Locicero,
Personal Representative of the Estate of Joseph P.
DiSante, Eugenia A. DiSante,
Plaintiffs-Appellees, Cross-Appellants,
v.
LITTON INDUSTRIAL AUTOMATION SYSTEMS, INC.,
Defendant-Appellant, Cross-Appellee,
John K. Rye, et al., Defendants.
 Nos. 89-1931, 89-1968.
 United States Court of Appeals, Sixth Circuit.
 March 19, 1991.
 
 On Appeal from the United States District Court for the Eastern District of Michigan, No. 87-74256; Gilmore, J.
 E.D.Mich.
 AFFIRMED.
 Before NATHANIEL R. JONES and BOGGS, Circuit Judges, and GIBBONS*, District Judge.
 PER CURIAM:
 
 
 1
 The principal issue of this appeal is whether the district court abused its discretion in its choice of a sanction for plaintiffs' violation of Rule 11 of the Federal Rules of Civil Procedure. Plaintiffs cross-appeal and argue that the district court abused its discretion in finding that they violated Rule 11 by failing to make reasonable inquiry prior to filing their complaint. We find that the district court did not abuse its discretion in either respect and affirm.
 
 
 2
 Plaintiffs (appellees and cross-appellants in this court) are Nicholas DiSante, his wife Mary DiSante, the estate of his brother Joseph DiSante and Joseph DiSante's widow, Eugenia DiSante. Defendant (appellant and cross-appellee in this court) is Litton Industrial Automation Systems, Inc. (Litton), the successor, by a 1987 acquisition and merger, to Lamb Technicon Corporation (Lamb). Other defendants in the court below included Lamb's pre-merger officers and directors and Lamb's employee stock option plan. The complaint, filed in November 1987, sought damages for securities fraud under Sec. 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), common law fraud and breach of fiduciary duty. The claims arose out of transactions in 1982 and 1985 in which plaintiffs and L & D Tool Company (L & D), a business jointly owned by Nicholas and Joseph DiSante, sold their shares of Lamb stock back to Lamb pursuant to stock redemption agreements.
 
 
 3
 The background for the claims is as follows. In 1963 L & D privately purchased 1500 shares of Lamb stock. The purchase was made subject to a stock redemption agreement restricting the transferability of the shares. The agreement required that, in the event L & D sought to sell all or a part of its shares or was dissolved, L & D must first offer to sell its stock back to Lamb at book value. As a result of stock splits, by 1982 L & D owned 135,000 shares of Lamb stock.
 
 
 4
 Nicholas and Mary DiSante also acquired Lamb stock in 1963, which was subject to a similar stock redemption agreement, requiring that the DiSantes offer the stock back to Lamb if they wanted to sell or upon their death. By 1982 they owned 51,000 shares of Lamb stock. Joseph DiSante acquired Lamb stock during the same time. In 1982 he owned 51,000 shares of Lamb stock, also subject to a stock redemption agreement virtually identical to the one between Lamb and Nicholas and Mary DiSante.
 
 
 5
 In 1982 L & D liquidated its assets. As a part of the liquidation plan, L & D and Lamb entered into an agreement for the sale of L & D's 135,000 shares of Lamb stock to Lamb. Nicholas DiSante negotiated with Lamb a fixed price of $12.00 per share instead of the book value price specified in the agreement. At this time the DiSantes individually entered into amended stock redemption agreements with Lamb, the essential elements of which were substantially similar to earlier agreements.
 
 
 6
 Joseph DiSante died in May 1985. In June 1985 the representative of Joseph DiSante's estate entered into an agreement to sell the estate's 51,000 shares of stock to Lamb for $11.22 per share, pursuant to the terms of the stock redemption agreement, which called for a sale at book value.
 
 
 7
 In July 1985 Nicholas DiSante approached Lamb about the reacquisition of his shares by Lamb. The parties agreed to a negotiated floor price of $12.50 per share, based upon book value at the close of 1984 plus fifty per cent of any appreciation in book value as of the end of 1985. Ultimately, Lamb paid Nicholas and Mary DiSante $13.77 per share.
 
 
 8
 Between 1979 and 1982 Lamb spent $1.3 million for improvements to three residential properties used as offices by then Lamb chairman John K. Rye. Rye failed to report these expenditures as income on his personal federal income tax returns and, as a result, was convicted of tax evasion in January 1987. Lamb, however, fully and properly accounted for the expenditures and included the resulting improvements as assets on its books and financial statements. The IRS did not challenge Lamb's tax returns, which capitalized and depreciated the improvements.
 
 
 9
 Lamb's 1983 report to shareholders stated that Lamb invested $9 million in research and development. Its 1984 report to shareholders indicated that Lamb had invested $5 million in research and development. Both 1983 and 1984 were difficult years for Lamb financially. Lamb accounted for the research and development expenditures fully and in accord with generally accepted accounting principles.
 
 
 10
 In April 1986, Litton contacted Lamb for the first time, proposing that the companies do business together. Discussions about a merger followed several months later, and Lamb's board accepted Litton's merger offer in February 1987. On April 3, 1987, Lamb was merged into Litton. Between 1975 and 1987, Lamb engaged in no activities concerning merger other than those with Litton.
 
 
 11
 Plaintiffs' November 1987 complaint alleged that the redemptions were not based on the true book value of the stock because (1) Rye diverted over $1.3 million of corporate funds to his personal use, causing Lamb not to reflect these funds in its financial statements; (2) Lamb falsely stated that it had spent $14 million on research and development in 1983 and 1984 and, if such expenditures were made, failed to reflect them on its financial statements in accord with generally accepted accounting principles; (3) Lamb had already decided to seek a merger with Litton or others in which Lamb would not be the surviving corporation at the time it reacquired plaintiffs' stock; (4) other corporate funds were diverted to the use of Rye and others, causing the consolidated financial statements not to reflect the true book value of Lamb; (5) Lamb filed fraudulent tax returns at Rye's direction, in order to make its tax returns consistent with Rye's returns.
 
 
 12
 After the complaint was filed, defense counsel met with plaintiffs' counsel to explore the basis for the complaint. Defendants' claim for Rule 11 sanctions was stated in defendants' answer and counterclaim.
 
 
 13
 In the early months of the litigation, plaintiffs filed an extensive request for production of documents. Defendants objected to the request. Plaintiffs moved to compel production and, after a hearing before the United States Magistrate, defendants were required to produce the documents. The magistrate awarded no costs because he found "reasonable justification" for the positions of all parties. Defendants appealed to the district court, which modified the magistrate's ruling to require production of documents from a more limited time period than plaintiffs had originally requested.
 
 
 14
 Meanwhile, defendants deposed all plaintiffs. No plaintiff had done any sort of prefiling inquiry. Without exception, all plaintiffs had undertaken no investigation of the allegations of the complaint and had no personal knowledge of any facts to support the allegations.
 
 
 15
 In June 1988, all defendants moved for summary judgment, relying in part on plaintiffs' depositions. The district court continued the hearing on the motions until October 19, 1988, in order to allow plaintiffs to conduct more discovery.
 
 
 16
 Between June and the October hearing date, the document production was completed, and plaintiffs deposed three individual defendants and Lamb's chief executive officer. This discovery revealed no facts to support the allegations of the complaint. On October 20, 1988, plaintiffs voluntarily dismissed their federal claims with prejudice and their state claims without prejudice.
 
 
 17
 Litton moved for Rule 11 sanctions. The district court found in an oral opinion that the factual allegations of the complaint were not well grounded in fact and that no reasonable prefiling inquiry had been made. Plaintiffs' counsel conceded to the court that the only facts on which the complaint was based were Rye's conviction for tax evasion and a decline in the book value of Lamb stock in 1982, 1983 and 1984. At a later hearing the district court reaffirmed this ruling, noting, however, the difficulty in conducting a prefiling inquiry when a prospective defendant possesses most of the relevant information. It imposed sanctions in the amount of $250.00, rather than the much larger amount of attorney fees defendant actually incurred between the filing of the complaint and its dismissal.
 
 
 18
 In selecting what it termed a "minimal" sanction, the district court reasoned as follows:
 
 
 19
 Defendant ... was uncooperative from the start other than making a nominal offer of judgment, which led to a great deal of delay in the resolution of this matter. Plaintiff has had to file motions of various kinds including a motion to compel.... Plaintiff could have deposed various people within the corporation ... but chose to wait ... for the documents requested to better structure the depositions.... When the Defendants finally complied after stonewalling for weeks and months, Plaintiffs withdrew their opposition to Defendant's motion for summary judgment.... [I]f the Defendants had been more cooperative from the start, the Plaintiffs would have dismissed the suit earlier and the court would not presently be dealing with a Rule 11 motion.
 
 
 20
 The district court then stated its view that there was a serious question whether defense counsel complied with Rule 3.2 or 3.4 of the Model Rules of Professional Conduct. Rule 3.2 requires a lawyer to make reasonable efforts to expedite litigation, consistent with the interests of his client. The district court opined that defendant's "stonewalling" was not a reasonable effort to expedite litigation. Rule 3.4 mandates that a lawyer make a reasonably diligent effort to comply with a legally proper discovery request. The district court said that defendant's activity in discovery was "questionable."
 
 
 21
 The district court concluded its remarks by saying that defendant "could have avoided this whole thing by being forthright, coming up with the evidence that showed they had no case, presenting it to the Plaintiff." In the court's opinion, "Defendant was obstructive and uncooperative throughout discovery and hence practically all of the attorney fees accumulated by Defendant could be attributed in part to Defendant's own lack of cooperation."
 
 
 22
 This court reviews the district court's ruling that a Rule 11 violation occurred and its choice of sanction under an abuse of discretion standard. Cooter & Gell v. Hartmarx Corp., --- U.S. ----, 110 S.Ct. 2447, 2461 (1990). Clearly, the district court did not abuse its discretion in finding a Rule 11 violation. Plaintiffs simply did not make a reasonable pre-filing inquiry and, without any factual basis, asserted fraud and other wrongdoing in their complaint. Plaintiffs' conduct is precisely the sort at which Rule 11 is directed.
 
 
 23
 Nor was the choice of a $250.00 sanction an abuse of the district court's discretion. A trial court has broad discretion to determine an appropriate sanction when a Rule 11 violation has been found. INVST Financial Group v. Chem-Nuclear Systems, 815 F.2d 391, 401 (6th Cir.), cert. denied, 484 U.S. 927 (1987). The wide range of possible sanctions can include monetary sanctions, either in the amount of reasonable attorneys fees or a different amount, or nonmonetary sanctions, such as requiring attendance at a continuing legal education program, a written or oral reprimand or simply a description of the violation in a written order or opinion. See Thomas v. Capital Security Services, 836 F.2d 866, 877-78 (5th Cir.1988).
 
 
 24
 Here, in choosing a sanction, the trial court properly considered the difficulty in making a pre-filing inquiry when virtually all of the information that might reasonably be obtained through pretrial investigation is in defendants' hands. Thus, the court examined the need to deter or punish this sort of Rule 11 violation. See INVST Financial Group, 815 F.2d at 404. Obviously, the court, in its discretion, determined that a substantial monetary sanction was not needed to deter or punish this type of violation. Its selection of a $250.00 sanction was consistent with this circuit's policy that the least severe sanction that is likely to deter should be imposed. Jackson v. O'Hara, Ruberg, Osborne & Taylor, 875 F.2d 1224, 1229 (6th Cir.1989).
 
 
 25
 The trial court also properly considered Rule 11's goal of compensating opponents of Rule 11 violators. See INVST Financial Group, 815 F.2d at 404. In connection with this issue, it correctly found the fact that much of defendants' attorneys fees were attributable to its own strategy choices in responding to the litigation. The attorneys fees sought by defendants exceeded $200,000.00. Given the procedural posture of this case and the very limited discovery conducted, obvious questions exist concerning the reasonableness of the requested fee. The district court could have elected to award the amount of reasonable attorneys fees as a sanction, but it was not required to do so. See id. at 401. Moreover, "[a] reasonableness inquiry necessarily requires a determination as to what extent [defendant's] expenses and fees could have been avoided and were self-imposed." Id. at 404. The trial court made a determination here that virtually all defendant's fees could have been avoided. It could have decided that no monetary sanction at all was warranted, and its award of a minimal sanction cannot be considered an abuse of discretion.
 
 
 26
 This court disagrees, however, with the implication in the district court's ruling that defense counsel violated ethical rules in this litigation--an implication unsupported by the record. To be sure, defendant chose to resist vigorously plaintiffs' request for document production. Its choice perhaps resulted in the district court's choice of a minimal $250.00 sanction. Yet there is nothing to suggest that defendant's strategy decision was without any legal or factual basis, particularly in view of the rulings of the magistrate and district court on plaintiffs' motion to compel.
 
 
 27
 The magistrate ruled that defendant was required to produce the documents, but said its position had "reasonable justification." The district court modified the magistrate's ruling in defendant's favor, thus concluding that, to some extent, its objections had merit. Under these circumstances, the court cannot say that defendant acted inappropriately or unethically. Rather, defendant simply made strategy decisions for which the district court could conclude, in its discretion, that defendant should bear the cost.
 
 
 28
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Julia S. Gibbons, United States District Judge for the Western District of Tennessee, sitting by designation